Case No. 22-1089, Vinyl Institute, Inc. Petitioner v. Environmental Protection Agency. Mr. Gauteng for the petitioner, Ms. Brown for the respondent. Mr. Gauteng, good morning. Good morning. I'll reserve three minutes for rebuttal. First, just briefly, I'll address the merits of the test order, and then I'll turn to the 19B motion. Two issues here. On the merits, when Congress amended TSCA in 2016, it gave EPA authority to issue test orders. EPA can do so without warning, giving the test order recipients an opportunity to submit comments beforehand. However, Congress also put in place numerous guardrails to ensure that this test order authority is not abused. In other words, EPA has to show more than just a data gap. It has to show a data need. So along these lines, Congress established in Section 4 a stepwise process to ensure that expensive and time-consuming advanced testing would only be required after EPA had first considered less intrusive tiered approaches to inform whether there was, in fact, a data need. So as part of that tiered approach, Congress placed certain obligations on EPA. First, EPA must consider all reasonably available information regarding hazard and exposure. Mr. Gauteng, we have a rule against reading the argument. I'm sorry. I'll help you because I have some questions. Yeah, go ahead. And I want my, I want to start with some questions that I think are pure questions of law. The EPA says its test order, and I'm reading from their brief 36 to 37, the EPA says their test order does not need to explain how it ruled out alternative testing methods. I know you disagree with that. What's your best reason for disagreeing? If you're, they have a conclusory answer and they say, we don't know of any names. We know under Section 4 and under the substantial evidence standard, you have to do more than a conclusory statement. You have to explain, what did I consider? What did I look at? And what is my reasoning? A conclusory statement, especially where you just rule out everything, doesn't tell me, the stakeholder, and it doesn't tell this court what, you know, what they did. Yeah. Then the EPA says on page 38 of its brief, its test order does not need to cite substantial evidence in the test order itself. I know you disagree with that as well. What's your reason for disagreeing? It would be the same answer. The statement of need, Congress set this up. The statement of need needs to describe how the information before it led to its conclusion. It has to explain its decision, and that comes from both the statement of need, specifically in Section 4. What's the authority that says they can't just do that during litigation? Well, this is an APA case. I mean, they're limited to the administrative record. And let's back up. They say it can be in the record, but it doesn't have to be in the test order. And I know you think that's wrong. Yes. What's your authority for thinking that's wrong? I think if you look at Section 4A2, that section anticipates a statement of need that tells us what its reason was and how it came to decide that there was a data need. You cannot just say, just look at the administrative record. There has to be some explanation. It says describe. It says explain. And now I'm going to go from pure law to law applied to facts. And by the way, I mean, of course they can't just explain post hoc in litigation. Right. Yes. What is your single best example of the EPA not explaining itself well enough? I think there are actually two. Just one. I'll do one because I think they have a chart on page 010 where they identify some analogs and then they identify with an X study. We don't know what the study is. It doesn't tell us what the study is. It just says an acute study for birds. So we don't know what that study is. And that's an important thing because acute studies can indicate low toxicity. They can be used to extrapolate to chronic toxicity. I thought that was the Elevara study. No, this is not the Elevara study. It's something else. So the Elevara study involved 112 TCE. That's the chemical at issue here. Right. I thought that was the acute study. That is an acute study. Okay. But there's an X in that chart that indicates there's also an acute study for 111 TCE, an analog. We don't know what that study is. This is the chart that has, I think, seven studies. Yes. Seven studies. And did you know which studies those were? No. I know you're saying you didn't know what this one study was. Yes. You didn't know what any of those seven studies were. No. Right. And we still don't. We still have to guess. Now that we have our chart that they pointed to in the administrative record, which was not cited in the test order, we can guess it's the Dow study, but we still don't have something connecting those two. We're in a world where there's going to be some testing. Okay. The chemical needs. We need to know something more about the chemical. Can you walk me through a chain of events where some lower level or screening tests occur and they don't lead to vertebrate testing? Yes. The way they set up is a stepwise process. Let's say you have three or four tiered things you could do. If those arrows are all pointing to low toxicity, or it's actually the weight of the evidence. It's not even all the arrows. If the weight of the evidence and those arrows are pointing towards low toxicity and low exposure and frequency in the environment, then EPA should be asking itself, should we order this more expensive, year-long, multi-year-long testing? That can be done through acute studies and extrapolating to chronic. It can be done through doing in vitro testing. It can be looking at analogs. When you put all that together, we're not asking for a threshold determination on unreasonable risk like you do under 4A1. We're saying, look at all of the information. Where are the arrows pointing? If they all seem to be pointing towards low toxicity and exposure, then maybe we shouldn't be doing a year-long test at 200 grand. I think I understand that now. Has the testing started, the quail testing? We have. We're still in the preliminary. We haven't started feeding the quails. What's the risk that this is going to become moot before we decide the case? The testing, as of right now, we think will be done in late summer, early fall, with the final report later than that. If we're going to rule for you, we better do it before summer? Yes, somewhat soon. When do the quail die? I've asked that question. It's not quite clear, but it would be at the end because you have to have them live. It's a chronic. They have to eat over time and then actually lay eggs. You start poisoning them with that? I wouldn't put it that way, Your Honor, but yes. They have to survive. They have to live. It's a chronic study. If we can go back to what you were saying about that chart. The statute says they have to identify the need for the new information, describe how information reasonably available to the administrator was used, etc. Your Honor, you just seem to be asking for a level of specificity that it's not clear to me is required by the statutory mandate. If you look at the plain language, it has a lot of guardrails that I was discussing. Everything has to do with best available evidence in a way to the evidence. I think to address your issue, though, EPA, this is a very discreet issue. It's, you know, what's the impact on BRRRS? And I think EPA is certainly qualified to quickly narrow the NAMs, the new approach technologies and the studies that would be relevant down to 2, 3, 4 that they have to discuss. So we're not saying, I think, as EPA argued, you have to look at this huge mass of evidence. It's a very discreet question. And again, because EPA can narrow it down pretty quickly. But then it does have to tell us whether it's the NAMs, whether it's the studies, what did they think? What was their reasoning? And I'm not seeing that in the test order or even in the administrative record. Didn't they say at JA9, they explain the table. They say, as shown in the table below, terrestrial environmental hazard data were identified, etc. There seems to be some discussion in addition. But I guess what I'm more interested in is, like, what's the legal principle you're trying to apply here? Because, like, the legal mandate is pretty broad and you're saying, well, it needs to be more specific. So how do I know what's specific enough in your view? I think that the test order is so conclusory if you use that as a jumping off point. I do think there has to be enough that we can sit down and understand. So, for example, with an acute study, they could say in a paragraph, here are our criticisms of this study. This is why we're not going to listen to it. We're not asking for a book or anything. That sounds really specific. I think that's what Congress said. If you look at the plain language of the statute, they place some significant burdens on EPA to do this. And I think it's because they didn't want EPA just issuing test orders, because they also have an option to do a consent agreement. No, I understand that. I just don't quite understand the legal standard you're asking us to apply. I mean, it's just a substantial evidence. Oh, yeah, it's a substantial evidence. I don't see why this isn't substantial evidence. You want just much more explanation and specificity, but I don't know why I need that just to find substantial evidence. I mean, if you look at the few cases where this court has implemented a substantial evidence standard under TSCA, this court has gone into great detail. Looked at the administrative record, looked at the explanations that the agency gave EPA, and then also looked at the record for contrary evidence. I mean, it is not arbitrary and capricious. And so the flip side of that coin is that the agency has to do its job. It has to identify on some level the facts that it considered, what its reasoning is, what judgment calls it made, and how it dealt with the contrary evidence. That is what Congress imposed on EPA. That is the plain language of the statute. See, my time is up. Thank you. We'll give you a couple of minutes to reply. Thank you. Good morning. Good morning. May it please the court. Laura Brown on behalf of respondent EPA. I'd like to begin by addressing the merits of the test order and then turning to the 19B motion. Now, TSCA requires, excuse me, TSCA requires EPA to assess the hazards and the exposures of 1, 1, 2 trichloroethane to birds. And in the test order, EPA explained that it conducted a systematic and comprehensive search on the avian toxicity chemical poses could potentially pose. And it identified one study, the aloe vera study. And that study concluded that the chemical killed and deformed chick embryos when it was injected into their eggs. EPA also explained in the test order that it had identified monitoring data that showed that this chemical is in the environment. It's in the air, water, soil, biota, all of which birds are exposed. How much of the test order was such was so generic that you could copy and paste it into the other 74 chemicals that you recently ordered testing? I do. The statement of need is specific to the to the work that was going to be done here. The work, the information that was required and the explanation of why it was required procedures that are going to be required. The protocol is specific to these tests, but there is nothing in the statute in Congress. Would it be fair to say the vast majority of the statement of need could be copy and pasted into 74 other chemicals? I disagree. Tell me why. The statement of need has to meet certain certain statutory requirements. However, Congress did not expect or or or dictate that EPA create some sort of exhaustive decisional document. The state, the statement of need has four requirements. Identify the need. Explain how information reasonably and available information was used to inform EPA's decision to order the test. Explain why you're requiring vertebrae testing and explain why you're issued an order. Those are unique to this circumstance, and those explanations do not have to be complicated and long. Here, EPA identified the need. That one test they could find on the toxicity of one one two TCA showed it was toxic. I'm with I'm with you on the 1979 study. It's it's good. Something for you. Can I ask you the two questions that I asked your opposing counsel about these two quotes from your brief? I'm at thirty six to thirty seven. The first thing you said is your test order does not need to, quote, explain how it ruled out alternative testing methods. Now you heard Vinyl's answer to that. What's your response? There is nothing in the statute that requires EPA to explain how it ruled out alternative information. And then you said on the next page, page 38, your test order does not need to, quote, cite substantial evidence in the test order itself. Response to that. EPA can rely on the record in support of the statements made in the order. The standard of review for a tester is substantial evidence taken in the record as a whole. Petitioner would like to avoid considering the statements in the record that directly support the statement that EPA made in the record. But you're distinguishing between the record and your explanation of the test order. Right. Well, I believe. Yes. Yes, I am. I am. And so let's say that you won't like this, but let's say that I disagree with you about those two pure questions of law, whether you need to explain how you ruled out alternative test methods and whether you need to cite substantial evidence in the test order itself. If I disagree with you there, I think I have to I have to vote with the petitioner here. Would you agree with me? Well, I would disagree with you. Yes, but I'm going to try to convince you to not disagree with me. So I would point you to Section 424 J of TSCA. And in that section, the statute requires that EPA list all of the studies it considered in conducting a risk evaluation and describe the results of those studies. That is not required in Section four for a test order. I mean, Congress, when Congress. The purpose of amending TSCA was to assist EPA to obtain the information it needs to conduct a risk evaluation for which EPA must have 20 ongoing at a time and is subject to strict statutory deadlines. Congress was not going to require it was clear in the legislative history that Congress is not creating procedural and burdensome processes, time consuming processes for EPA to get this information. That was an explicit one of the explicit intents of Congress in amending TSCA and giving EPA this authority to issue test orders. And so for petitioner and Amici to to assert that EPA needs to go and explain every study it identified, explain why every new approach methodology is inappropriate. It's well setting EPA up to the issues that it faced before TSCA and obtaining the information it needs to quickly conduct risk evaluations as Congress has required it to do. I take their argument to be a little different than that. I think maybe if the test order had said, look, these are the two or three closest, most relevant studies that are out there already. And here's why they're not relevant enough. Here's why they're not good enough. Then I think that that might have gotten you there. Well, I think they did. OK, tell me. I had some extensive search for avian subscribed in the test. It explained the databases it searched. It said we found one study, the aloe vera study, but it's not good enough. And I think petitioners would agree it's not good enough. And EPA explained why it's not good enough, because it's acute study. That means it's the birds are being subjected to a very high dosage of the chemical in their eggs. I'm with you on the 1979 pheasant study. And they discussed it and they said, this is why it's not acceptable. And they said, we searched for other analogs and they identified them in the test order. Analogs are similar chemicals that they could use. This does get awfully into the weeds. And I think this case probably has more to do with pure questions from all. But we'll ask you. I'm a J41. The order is addendum E. And I think it's describing. I think this is the 1979 pheasant study, I think, but it is a pheasant study about one, one, one. Does that ring a bell at all? I'm sorry. Yes. And so EPA probably presumably decided that this study wasn't enough to better understand the effects of the similar chemical one, one, two, TCA. I get it. You're going to tell me the reason. But why? Why wasn't the reason in the order? The reason wasn't the order. EPA explicitly stated we need chronic toxicity data. And this is important because I think it's somewhat lost on non-toxicologists. But chronic toxicity data, which is clearly stated, the need EPA has is for chronic toxicity data. If birds are exposed to this chemical in the environment at little tiny doses for their whole lifespan, is it going to have an adverse effect on their eggs, on their growth, et cetera? Judge Walker's question was, are there chronic studies for the one, one, one TCA? No, no, they're not. What was the study X in JAN? That's the study that Judge Walker is referring to. It's not chronic. It's not chronic. EPA explained they didn't find any chronic studies for any of the similar chemicals and they need chronic data. There is a table with seven studies, and I honestly can't tell you the JAN number off the top of my head. I think that your opposing counsel was discussing it, and he said he can't figure out what those seven studies even are. Should he have been able to figure it out? Yes, I think he should have. I will say it's a little hard to find. And so one point I wanted to raise is that I do not think it's post hoc rationalization for counsel to identify in the record where support exists. So I am pointing you. You're distinguishing between the record and the test order, right? And the record wasn't released with the test. Oh, I thought you were asking about. Well, then I see. OK, you're right. I pivoted for a second there. Well, I will say in the test order, you're right. The ones that EPA found will be to be irrelevant were not identified. The one that it found to be relevant, but not enough because it was an acute exposure. And it explained the limitations in the test order. It wasn't. It shouldn't have been a surprise to to petitioners to understand why we couldn't EPA couldn't rely solely on the elevator study. So are you conceding that vinyl needed the administrative record in order to understand the order? Nope, I'm not conceding that. First of all, vinyl by the Vinyl Institute review had it had access to the analogs EPA searched for data. EPA in its test order explained step by step how it looked for these studies. They could have repeated that process. They never named the study. They did not name the study. Other than the 1979. That's correct. Because they found out they determined they were irrelevant. I mean, it's we're at this point where is EPA burden to to explain everything they did in a test order. And the purpose of the test order is the reason Congress has given EPA this new authority is to make it simpler. The process simpler for EPA to get the information. I really don't think that that squares with the legislative history. The actual language in the statute describe how you used available information. It does not say explain how you ruled out using existing studies and identify those studies. Section 24 J to some extent does that. It says EPA when you're issuing issuing the risk evaluation, which will ultimately potentially regulate this chemical. Then EPA has more. It has to show more of its work. But I think on a spectrum between that extreme listing every book, every article you looked at and. Take our word for it. Other than 1979 study, we're not going to give you any specifics. And you have to sue to find out more. I think that's a broad spectrum. And I think probably the standard is in between. Well, I would say I don't think they have to sue to find out more. They could have requested the record from EPA. They also had the opportunities that information to EPA. And I know my time is up and that goes to the 19 emotion. But for these reasons, as your counsel has further questions, the position for review should be denied. And then I think the emotion should be denied. Mr. God, why don't you take 2 minutes? Thank you. Just a couple of points to go back to kind of the law here, the way Congress set this up. Let me back up. What EPA is saying is that there is a data gap. There is no chronic data. So Congress recognized that that would happen. So what did it do? It said you don't go straight to advanced testing. You can use tiered approaches, including acute studies to answer to inform that that issue. And again, it goes back to the where the arrows pointing. What is the weight of the scientific evidence using indirect methods? So the fact that there's no chronic testing out there on 1, 2, 1, 1, 2, TCE, Congress anticipated that and said, we're going to do a stepwise approach here. But why isn't it enough for them to say we need this type of study to understand the effects, the chronic effects on the birds? And isn't 1 out there. So now we need to do 1. I think that's what I was just talking about. That there are other ways to get to that information and that answer without requiring expensive, time consuming, advanced testing. You do it through things like acute tests, like that analog, the 1, 1, 1, TCE. Or computer modeling. Or computer modeling. In vitro. In vitro, exactly. And they were supposed to. But they have a data gap spreadsheet that explains what they looked at and what's missing from that. I mean, it just seems like there is a lot in the record here. And I'm just trying to understand, like, why? What is the basis for needing so much more? Because I think Congress told them that they had to engage in some level of discussion to justify the need. And instead of us having to take their word for it. I think if you just look at the test order itself, there's a lot of conclusory sentences where we just have to say, okay, we believe you. And that is not what plain language of the statute asks. I understand you'd be saying a lot of this needs to be in the test order. And I guess isn't that just very a formality? Like, if this testing is needed and it's supported by the record, why does it have to be in the test order? I think because Congress used the word describe and explain. But you're talking about the level of detail in describing and explaining for a higher level. It just seems to me, isn't that a formality? You want us to remand it so they can take the information that's already there and put it in a different place? I don't think they have the information yet. If you look at the administrative record, they don't explain. We have a chart of NAMs. But there's no explanation why they ruled out at least a couple of two key ones, we think. If you look at that big spreadsheet of all the studies, there's no explanation. What about that 11TC test? Were there any other studies that you thought about? There's no explanation. We just have charts. And so under the substantial evidence standard, even in the administrative record, they still have to point this court to something where they did some analysis. It's kind of like they started it, but they didn't finish it. And I don't think this is a failure to explain case. It is a failure to explain case, but I also think it's a failure to show substantial evidence. We don't have their explanations. I'm interested in why and what you think the standard of review is for this particular legislation. Do you think it's changed from when CMA said this requires a searching substantial evidence, rigorous substantial evidence, almost a sui generis substantial evidence? And you haven't even discussed that. Do you think the standard of review has changed since CMA? No, I don't think there was anything in the amendments that I'm aware of that changed the substantial evidence standard. It's not just substantial evidence. It's a higher heightened substantial evidence. Yes. All right. I'm glad to. And in fact, and in fact, you know, typically substantial evidence standard under the APA is not a way to the evidence. Congress said this is a way to evidence analysis. That's the plain language. Thank you.
judges: Henderson, Walker, Pan